[No. 1503.]

## Looney O'Neal v. The State.

1. PRACTICE—CHANGE OF VENUE.—The statute requires that a motion for a change of venue shall be supported by the affidavits of at least two credible persons resident in the county where the prosecution is instituted. This requirement is not met by the supporting affidavit of the defendant himself and one other person.

2. SAME—PRACTICE IN THIS COURT.—A change of venue is within the judicial discretion of the trial court, and this court will not revise the action of the court below, in the absence of a showing of abuse of that discretion to the prejudice of the accused.

3. SAME.—CONTINUANCE is properly refused when there was a want of diligence in securing the attendance of the absent witness. See the opinion for a showing *held* insufficient.

4. SAME—THEFT—EVIDENCE.—The establishment of a conspiracy between the defendant and other parties to perpetrate a theft, and to sell the stolen property and divide the proceeds, is a sufficient predicate to admit as evidence against the defendant alone, on his separate trial, the acts and declarations of his co-conspirators, even though such acts and declarations transpired in defendant's absence and after the theft was completed, but before the sale of the property and division of the proceeds. See the opinion *in extenso* for an elaboration of the question.

5. SAME—PRINCIPAL OFFENDERS—CHARGE OF THE COURT. —When upon any principle of law involved the charge of the court is explicit and correct, it is not error to refuse special instructions however correct they may be in the abstract. See the statement of the case for charges of the court upon principal offenders *held* correct, wherefore special charges requested upon the subject were properly refused.

6. SAME—PRINCIPAL OFFENDERS AND ACCOMPLICES DISTINGUISHED.—In *Cook* v. *The State, ante* p. 96, the distinction between principal offenders and accomplices is properly stated as follows: "The acts constituting an accomplice are auxiliary only, all of which may be and are performed by him anterior and as inducements to the crime about to be committed; while the principal offender not only may perform some antecedent act in furtherance of the commission of the crime, but when it is actually committed is doing his part of the work assigned him in connection with the plan, and in furtherance of the common purpose, whether he be present when the main fact is accomplished, or not."

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The opinion discloses the nature of the case and the result of the prosecution.

Alfred Shelton was the first witness introduced by the State. He testified that he knew the defendant, and he identified him in court. The witness heard that G. W. White had some cattle stolen from him in January, 1883. Two or three weeks before the theft of these cattle the witness spent a night at the house of John Glenn, and saw the defendant there that night. The defendant spent that night at Glenn's, and left early next morning with John Glenn, who started to Gordon. The witness knew that the defendant left with Glenn, but did not know that he accompanied Glenn to Gordon.

Pat Greenstreet testified, for the State, that he saw the defendant and John Glenn in the town of Gordon on the twenty-fourth day of January, 1883. He fixed the time by the date of an order for goods, and by a bill of lading he had at the time. Glenn and the defendant were together at that time.

Dawson Blankenship testified, for the State, that he knew both the defendant and George Boucher. The witness was on the McNeil place, which was in charge of G. W. White, on January 29, 1883, and that morning he saw the defendant and George Boucher, accompanied by a man whom he did not know, pass along the road near the fence, going in the direction of town. They passed the witness at a distance of fifty or seventy-five yards. White's cattle were then in the field. Boucher inquired of the witness if White wanted to sell those cattle. Witness replied that White did not want to sell but wanted to buy, and asked Boucher if he had any cattle to sell. Boucher replied that if he had cattle for sale he would not be trying to buy. White's cattle were stolen in the night of the day on which these parties passed the witness.

Cross-examined, the witness stated that it was between eight and nine o'clock a. m. when the parties named passed him. They were then traveling towards Stephensville, and on the road from the defendant's house to the town of Stephensville. That was the road usually traveled by the defendant in going from his house to Stephensville. The party were just opposite or a little past the witness when he first noticed them. He did not recognize the third party. Nothing more than that related in the examination in chief passed between the witness and the parties.

W. C. McNeil testified, for the State, that he knew the defend-

ant and George Boucher. He heard of White having some cattle stolen from him on January 29, 1883. About ten o'clock on the morning of the day on which the cattle were stolen, the witness saw the defendant and Boucher, about three-quarters of a mile from the town of Stephensville. They were going up the Griffin road towards home. On his cross-examination the witness said that a sale of cattle he made on that day enabled him to fix the date on which he saw the parties named. They were traveling the road which lead from Stephensville to their respective homes.

John Carr testified, for the State, that he saw the defendant and Boucher pass the McNeil place, eight miles from Stephensville, on January 29, 1883. The defendant was about three-quarters of a mile in advance of Boucher.

G. W. White testified, for the State, that on January 29, 1883, he owned cattle which were then pastured in a field. He saw them last on that day about an hour by sun, when he turned them out to go to water. He missed them on the morning of January 30, and searched for them on their former range on the Bosque, about five miles distant. He did not know that he saw the defendant about the time that the cattle were stolen. He saw the witness Blankenship on the morning of the twenty-ninth, and saw three men passing along the road near him, and heard the conversation between them and Blankenship, as related by the latter on the stand. About twelve days later the witness discovered his cattle in the pen of John Glenn, in Erath county, and recovered all of them except one yearling. Twenty-five was the number of the cattle stolen. Glenn consented to the witness taking the cattle. Four yearlings were branded with a Texas star, one cow was branded M H, and two were branded T H. Several other brands, which the witness could not recall, were in the bunch. Glenn's place is about twenty miles in a northerly direction from Stephensville, and north from where the witness lived. The witness at that time lived about one and a half miles north of Stephensville. The witness gave no one his consent to take the cattle. They were taken in Erath county, Texas.

John Mauck testified, for the State, that he lived about twenty miles northwest from Stephensville. He had heard of the theft of White's cattle. On Tuesday, January 30, 1883, the witness saw John Glenn, whom he knew. Glenn came alone to the witness's house on the morning of that day. Within an hour and a half

two other men came up to the witness's house, driving some thirty-six head of cattle. They came from a northerly direction. The witness could not say that he could recognize those two men. One of them, however, he thought was called George Boucher, and the other somewhat resembled the defendant. The cattle were tallied in the witness's pen, and their tails swabbed. Glenn took down the marks and brands in a book or on a piece of paper. This party took dinner at the witness's house, and left together. Glenn said that he had bought the cattle from some strangers who were driving them from the east; that he wanted to pen and tally them at witness's pen, and leave them there until he went to Gordon and procured one hundred and fifty dollars, necessary to complete payment for them. The cattle were left in the witness's field for eight or nine days, when they were driven off by Glenn.

Mrs. Mauck, the wife of the last witness, testified, for the State, that she was positive the defendant was one of the two men who came to her house with a bunch of cattle on January 30, 1883. Glenn came to the house first and requested her to cook dinner for himself and two other men, from whom, he said, he had purchased some cattle, and who would presently arrive. She agreed to cook the dinner, but declined to charge for it. In the course of a short time the defendant and another man arrived at the house with a bunch of cattle. The defendant took a newspaper from his pocket (the Stephensville Empire, hereafter introduced in evidence) which, after reading, he laid on the witness's bed and left there. The paper exhibited to the witness was the same. It then as now had the name "L. D. O'Neal" written on the margin. On the day before this trial the witness saw, in the jail, the same two men who drove the cattle to her house on January 30, and learned that one was named O'Neal and one Boucher. The defendant is one of them. Glenn said at the witness's house, on the day mentioned, that he bought the cattle from strangers driving from the east, and that he would have to go to Gordon to get one hundred and fifty dollars more and get his bill of sale.

On her cross-examination the witness detailed her complete identification of the defendant as the man who left the paper on her bed, and whom, on the day before this trial, she saw at the jail.

Eugene Scott, editor of the Stepensville Empire, testified that he knew the defendant, who was a subscriber to his paper. The

witness customarily wrote the names of his subscribers on the margin of their papers. The name "L. D. O'Neal" on the margin of the paper in evidence, which was the Stephensville Empire of the issue of January 27, 1883, the witness believed to have been written by himself.

The witnesses Fagan and Ham testified, for the State, that they saw the defendant and George Boucher in the town of Gordon either on the evening of January 31, or the morning of February 1, 1883.

The witness Ross testified, for the State, that he did not know the defendant, but supposed that he could claim to know Boucher, though when he met him in Gordon, about the last of January, 1883, he, Boucher, passed under the name of Simms. About the first part of the week, and about the last of January, 1883, John Glenn came to the witness in Gordon, and requested him to write a bill of sale for him for some cattle he had bought from some strangers. Boucher came up shortly, and Glenn remarked to witness: "That is Mr. J. C. Simms, the man from whom I bought the cattle." Boucher, or Simms, as he was called, was near Glenn at the time, and could readily hear what was said. Glenn gave the witness a memorandum book containing the marks and brands, and from that the witness wrote out the bill of sale. Witness could not remember the marks and brands, but remembers that one of the brands given was a Texas star. Glenn took the bill of sale, and went to justice of the peace Gibbs to get it acknowledged. Boucher, or Simms, was present but once, and a very short time, and heard but little said by witness or Glenn. The witness has since seen the man Simms, or Boucher, in charge of an officer.

Jim Black testified, for the State, that he saw Glenn, George Boucher and the defendant in Gordon, on the last day of January, or the first day of February, 1883. Glenn requested the witness to assist him in getting a seal to affix to a bill of sale for some cattle he had bought of some strangers. The witness wrote an order to Mrs. Gibbs, the wife of the justice of the peace, for the seal, and gave it to Glenn. Glenn gave the order to one of the parties present, but not to the defendant. The witness did not see the man in court to whom Glenn gave that order.

Cross-examined, the witness said that he did not notice the other parties when Glenn first spoke to him about the seal. He wrote the order in a saloon, and afterwards saw the parties on the gallery of the saloon. They were not present when Glenn

spoke to him about the seal.  Glenn gave the order to one of them, and the witness left.

Jesse Niblett testified, for the State, that he thought he saw the defendant in Gordon between the last day of January and the fifth day of February, 1883, but was not absolutely positive. He saw George Boucher in witness's store, with John Glenn and Ross, about the last of January, 1883, when Boucher, under the name of J. S. Simms, executed a bill of sale to John Glenn.

W. B. Slaughter testified that he had known the defendant and Glenn for years, and had often seen them together.  A week or two prior to the theft of White's cattle, the witness exchanged some gold for greenback money with the defendant.  The defendant then said that he had won a game in Gordon.  The witness asked him if Glenn was in the game, and he said not, but that he saw Glenn on the streets of Gordon.

Sheriff Gilbraith testified, for the State, that he took the defendant and George Boucher before Mrs. Mauck for identification.

The charges of the court referred to in the fifth head-note of this report reads as follows:

"Fifth.  The law is, gentlemen, that all persons are principal offenders who are guilty of acting together in the commission of an offense; and principals, whether jointly indicted or not, may be legally prosecuted and convicted as such, provided the evidence adduced against each clearly and satisfactorily establishes. the guilt of each.  When an offense has been committed, to determine whether the persons charged with its commission are principals or not, the criterion is:  Did the parties act together in the commission of the offense?  Was the act constituting such offense done in pursuance of a common intent, and a previously formed design, in which the minds of all of such parties. united and concurred?  If so, then in law all are alike guilty, provided the offense was actually committed during the existence and in execution of the common design and intent of all, whether in point of fact all were bodily present or not on the ground when the offense actually took place.

"If, therefore, the cattle alleged in the indictment to have been stolen were actually taken by some person other than the defendant, under circumstances constituting such taking theft, yet, if the defendant acted together with such person in such taking, so as to constitute him a principal therein within the meaning of the preceding instruction, he would be guilty; and

if you so find from the evidence, and should further find from the evidence that said cattle were at the time of such taking the property of the alleged White, and that the same were so taken in the county and at or about the time laid in the indictment, you will find the defendant guilty, and assess his punishment as before directed."

The motion for new trial raised the questions discussed in the opinion. The opinion of this court discloses the exceptions taken to parts of the evidence.

*Neill & Young* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. Defendant and two other parties were indicted jointly for the theft of twenty-five head of cattle. He severed on the trial from his co-defendants, and was convicted, his punishment being assessed at three years confinement in the penitentiary.

1. There was no error in the action of the court in striking out and refusing to consider the defendant's application for a change of venue, because the application did not conform to the requirements of the statute. It was supported by the affidavit of but one other person than the defendant, whereas the statute requires the supporting affidavits of " at least two credible persons, residents of the county where the prosecution is instituted." (Code Crim. Proc., Art. 578.) Where the statute is not fully complied with in an application for a change of venue, the application is fatally defective, and the court is under no obligation to consider it. (*Mitchell v. The State*, 43 Texas, 512.) A change of venue is within the judicial discretion of the court, and, on appeal, in the absence of a showing that this discretion has been abused to the prejudice of the defendant, this court will not revise the action of the court below. (*Clampitt v. The State*, 9 Texas Ct. App., 27.) It has not been made to appear in this case that the court abused its discretion in ruling as it did upon the defendant's application for a change of venue, or that the defendant has thereby been prejudiced.

2. There was no error in overruling the defendant's application for a continuance. It showed upon its face a want of reasonable diligence on the part of the defendant to obtain the testi-

mony of his absent witness. An attachment for the witness was issued at the instance of defendant to Palo Pinto county, on the sixteenth day of April, 1883, which was returned on the nineteenth of April, 1883, by the sheriff of Palo Pinto county, "not found." It was not until the eighth day of May, thereafter, that the case was called for trial and the application for a continuance presented. It is therefore apparent that there was ample time after the return of the attachment, and before the case was reached for trial, for the defendant to have an *alias* attachment executed upon the witness in time to have him present at the trial; and no reason was shown why this was not done.

3. Upon the trial the State was permitted to prove, over the objections of the defendant, certain acts and declarations of other persons who were engaged with defendant in the commismission of the theft. This testimony was objected to by defendant: First, because a predicate which would authorize its admission had not been established; and, second, because the defendant was not present when the acts and declarations occurred, and because the same occurred *after* the completion of the theft.

It is quite apparent to our minds, from the evidence in the case, without considering the acts and declarations objected to, that the defendant and three other parties had conspired together to steal the cattle—not only to steal them, but to sell them and divide the proceeds of the sale among themselves. Such a conspiracy being satisfactorily proved to the trial judge, a sufficient predicate was laid to authorize and require him to admit in evidence against the defendant the acts and declarations of the co-conspirators. Nor do we think that the acts and declarations were inadmissible because they occurred *after* the completion of the theft. Upon this subject Mr. Wharton says: "In cases of crimes perpetrated by several persons, when once the combination or conspiracy is established, the act or declaration of one conspirator or accomplice in the prosecution of the enterprize is considered the act or declaration of all, and therefore imputable to all. All are deemed to assent to or commend what is said or done by any one in furtherance of the common object. * * * Such conspiracy being proved (which is usually indirectly, from circumstances), the declarations of one co-conspirator, in furtherance of the common design, as long as the conspiracy continues, are admissible against his associates, though made in the absence of the latter." (Whart. Cr. Ev., Sec. 698.)

Other authors state the rule substantially as above quoted. (3 Greenl. Ev., Sec. 94; 1 Bish. Crim. Proc., Secs. 1248–1249.) Mr. Bishop further says: "Where, in larceny, it was shown that the conspiracy extended as well to the dividing of the stolen goods as to the theft, what one did between the stealing and the dividing was deemed good evidence against both." (2 Bish. Cr. Proc., 230.) The author refers to *Scott* v. *The State*, 30 Alabama, 503, in support of the proposition quoted, and upon an examination of that case we find it to be a parallel case to the one now under consideration, and announces the doctrine stated by Mr. Bishop.

In Scott's case, the theft was committed by him and one West; the property stolen was a watch, and the circumstances indicated that the common design of Scott and West was not only to steal the watch, but extended to the sale of it, and a division of the proceeds of the sale. After the theft was complete, and the parties had separated, West, in passing a toll bridge, paid double toll; that is, paid toll for himself and Scott, who was not present, but who came after West, on the same road. This act of West was held to be competent evidence against Scott. In passing upon the question the court says: "Conceding that the payment of the double toll was made after West had done enough to authorize his conviction for the larceny of the watch, yet there is evidence which conduces strongly to show that it was made '*while the conspiracy was pending, and in furtherance of the common design.*' The evidence justifies the conclusion that the conspiracy between West and the plaintiff in error was not confined to the mere felonious taking and carrying away of the watch, but extended to a division of the profits of the larceny, at a meeting to be held by them at another place as soon as convenient. Having given to their conspiracy that extent, neither of them, when indicted, has the right to call upon the court to diminish its extent for the purpose of relieving him from any of its consequences." We fully concur in the doctrine enunciated in the Scott case, and we think it is decisive of the question as presented in the case before us.

Here, as in the Scott case, it is evident that the conspiracy extended beyond the mere taking of the cattle. It embraced the purpose and design of a sale of the cattle, and a division of the proceeds of that sale among the conspirators. It was while this conspiracy was yet unaccomplished entirely, but, in so far as a sale and division of the proceeds were contemplated by it,

was still incomplete and pending, that the acts and declarations of defendant's co-conspirators, which are objected to as inadmissable evidence against him, transpired, and were occasioned in furtherance of the common design. We are of the opinion that the court did not err in admitting the testimony objected to by the defendant.

4. Exceptions are presented by the defendant to the charge of the court and to the action of the court in refusing special charges requested by defendant. It is urged that the charge as given to the jury did not correctly define a principal in a crime, and did not properly distinguish between a principal and an accomplice in crime, and that the special charges requested by the defendant corrected this error in the charge of the court, and should have been given. We are of the opinion that the charge of the court in this respect is in perfect accord with the decisions upon this subject, and was sufficiently full and explicit when considered with reference to the facts of the case. Such being the case, it was not error to refuse the requested charges, notwithstanding their correctness, perhaps, as abstract propositions of law.

Counsel in their brief request us to plainly state the difference between a principal and an accomplice in crime, as defined in our Code. We cannot do so more clearly than has already been done by this court in the case of *Cook* v. *The State*, decided at the last Austin term. (*Ante, p.* 96.) We reproduce here what is said in that case upon the subject: "The proper distinction between the two characters of offenders is this: The acts constituting an accomplice are auxiliary only, all of which may be and are performed by him anterior and as inducements to the crime about to be committed; while the principal offender not only may perform some antecedent act in furtherance of the commission of the crime, but when it is actually committed, is doing his part of the work assigned him in connection with the plan, and in furtherance of the common purpose, whether he be present when the main fact is to be accomplished, or not."

We find no error in the conviction, and the judgment is affirmed.

*Affirmed.*

Opinion delivered October 20, 1883.